# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NORTH CAROLINA
### CHARLOTTE DIVISION

CIVIL ACTION NO. _____

CHARLOTTE SCHOOL OF LAW, LLC;
and INFILAW CORPORATION,

    *Plaintiffs*,        COMPLAINT

  v.             DEMAND FOR JURY TRIAL

AMERICAN BAR ASSOCIATION; COUNCIL
OF THE SECTION OF LEGAL EDUCATION
AND ADMISSIONS TO THE BAR, AMERICAN
BAR ASSOCIATION; and ACCREDITATION
COMMITTEE OF THE SECTION OF LEGAL
EDUCATION AND ADMISSIONS TO THE
BAR, AMERICAN BAR ASSOCIATION,

    *Defendants*.
_____/

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs, Charlotte School of Law, LLC and InfiLaw Corporation, by and through their attorneys at Kirkland & Ellis LLP and Robertson & Associates, P.A., bring this civil action against Defendants—American Bar Association; Council of the Section of Legal Education and Admissions to the Bar, American Bar Association; and Accreditation Committee of the Section of Legal Education and Admissions to the Bar, American Bar Association (collectively, "ABA")—and allege as follow:

### NATURE OF THE ACTION

1. This is a civil action for declaratory and injunctive relief and damages to remedy the ABA's violation of the due process rights of the Charlotte School of Law in the accreditation process. The ABA's due process violations caused Charlotte to be excluded from the federal Title IV program and made it impossible for Charlotte to continue to operate as a law school.

After graduating thousands of students, more than 80% of whom passed the bar exam, over the course of more than a decade, Charlotte was forced to shut down in 2017. This Court should hold the ABA accountable for abusing its accreditation authority and causing Charlotte to close its doors.

**PARTIES**

2.      Plaintiff Charlotte School of Law, LLC, operated a law school, the Charlotte School of Law ("Charlotte" or "the law school") in Charlotte, North Carolina, from 2006 through 2017.

3.      Plaintiff InfiLaw Corporation ("InfiLaw") owns Charlotte School of Law, LLC.

4.      Defendant American Bar Association is a corporate entity organized into various components, including the "Council" and the "Accreditation Committee," as described below.

5.      Defendant Council of the Section of Legal Education and Admissions to the Bar, American Bar Association ("Council") is a component of the American Bar Association. Pursuant to 34 C.F.R. Part 602, the U.S. Department of Education ("DOE") has recognized the Council as the agency for accrediting programs in legal education that lead to a professional degree in law and the law schools offering such programs.

6.      Defendant Accreditation Committee of the Section of Legal Education and Admissions to the Bar, American Bar Association ("Committee" or "Accreditation Committee") is a component of American Bar Association. The DOE's recognition of the Council as an accrediting agency extends to the Committee for decisions involving continued accreditation of law schools.

7.      The American Bar Association, the Council, and the Accreditation Committee are collectively referred to herein as the "ABA."

## JURISDICTION AND VENUE

8.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1332(a)(1), and 20 U.S.C. § 1099b(f).

9.    This Court has federal question jurisdiction under 28 U.S.C. § 1331 because Plaintiffs' civil action against Defendants arises under the Constitution, laws, or treaties of the United States and presents the question whether Defendants violated their federal obligation to provide due process in the accreditation process.

10.    This Court has diversity jurisdiction under 28 U.S.C. § 1332(a)(1).  Plaintiffs and Defendant are citizens of different States.  Charlotte is incorporated in Delaware and has its principal place of business in North Carolina.  InfiLaw is incorporated in Delaware and has its principal place of business in Florida.  The American Bar Association is incorporated in Illinois and has its principal place of business in Illinois.  The Council and the Committee are components of the American Bar Association and are not separately incorporated.  The matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

11.    This Court has jurisdiction under 20 U.S.C. § 1099b(f), which provides: "Notwithstanding any other provision of law, any civil action brought by an institution of higher education seeking accreditation from, or accredited by, an accrediting agency or association recognized by the Secretary [of Education] for the purpose of this subchapter and involving the denial, withdrawal, or termination of accreditation of the institution of higher education, shall be brought in an appropriate United States district court."

12.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(b).  The Committee and Council sent their decisions to the law school's address in Charlotte, North Carolina, and the law school received the decisions in Charlotte, North Carolina.

3

## FACTUAL ALLEGATIONS

### Charlotte School of Law

13.     Charlotte was founded in 2004 and thereafter was accredited (or, in the ABA's terminology, "approved") by the Council.  The Council provisionally approved Charlotte in 2008 and fully approved Charlotte in 2011.

14.     During the more than a decade it operated as a law school, Charlotte's mission was inclusive excellence in legal education.  Charlotte's programs and services were directed toward enabling individuals, including those from groups historically excluded from legal education and the legal profession, to fulfill their potential to become lawyers or pursue other satisfying careers.  Consistent with its mission, Charlotte had a highly diverse student body.

15.     Charlotte has produced more than 2,200 graduates.  Charlotte graduates have gone on to pursue successful careers in various fields of law, in private practice and the government, in North Carolina and other States.

16.     The large majority of the Charlotte graduates have passed the bar exam.  For classes graduating from 2010 to 2016, the ultimate bar passage rate exceeded 80%, according to data possessed by Charlotte and presented in the chart below.

| Graduation Year | Ultimate Bar Pass Rate |
|---|---|
| 2010 | 94.1% |
| 2011 | 96.2% |
| 2012 | 92.9% |
| 2013 | 88.9% |
| 2014 | 83.5% |
| 2015 | 74.2% |
| 2016 | 59.6% |
| **Total** | **80.3%** |

17.     The ultimate bar pass rate of the more recent graduating classes can be expected

to increase in the future as more graduates of those classes pass the bar.

## ABA Accreditation

18.     Pursuant to 34 C.F.R. Part 602, the U.S. Department of Education ("DOE") has recognized the Council as the agency for accrediting programs in legal education that lead to a professional degree in law and the law schools offering such programs.

19.     The DOE's recognition of the Council extends to the Committee for decisions involving continued accreditation of law schools.

## ABA Standards

20.     The Council has promulgated Standards and Rules of Procedure for Approval of Law Schools ("Standards").

21.     Standard 301(a) provides: "A law school shall maintain a rigorous program of legal education that prepares its students, upon graduation, for admission to the bar and for effective, ethical, and responsible participation as members of the legal profession."

22.     Standard 501(a) provides: "A law school shall adopt, publish, and adhere to sound admission policies and practices consistent with the Standards, its mission, and the objectives of its program of legal education."

23.     Standard 501(b) provides: "A law school shall only admit applicants who appear capable of satisfactorily completing its program of legal education and being admitted to the bar."

24.     Interpretation 501-1 provides: "Among the factors to consider in assessing compliance with this Standard are the academic and admission test credentials of the law school's entering students, the academic attrition rate of the law school's students, the bar passage rate of its graduates, and the effectiveness of the law school's academic support

program." Interpretation 501-1 also states: "Compliance with Standard 316 is not alone sufficient to comply with the Standard."

25.     Standards 301(a), 501(a), and 501(b) and Interpretation 501-1 are vague and lack objective tests for determining compliance or noncompliance.

26.     Maureen O'Rourke, the current Chair of the Council, at a Council meeting held in October 2016 (when she was Chair-elect), publicly admitted what many people involved in the ABA accreditation process have long known: that the ABA views its own Standards as "fuzzy and hard to enforce." Chair O'Rourke's admission is contrary to the provisions of the HEA and DOE regulations requiring an accrediting agency to have "clear standards" of accreditation. 20 U.S.C. § 1099b(a)(6); 34 C.F.R. § 602.18(a) (emphasis added).

27.     Standard 316, captioned "Bar Passage," provides in pertinent part as follows:

Standard 316. BAR PASSAGE

(a) A law school's bar passage rate shall be sufficient, for purposes of Standard 301(a), if the school demonstrates that it meets any one of the following tests:

    (1) That for students who graduated from the law school within the five most recently completed calendar years:

        (i) 75 percent or more of these graduates who sat for the bar passed a bar examination; or

        (ii) in at least three of these calendar years, 75 percent of the students graduating in those years and sitting for the bar have passed a bar examination.

*  *  *

    (2) That in three or more of the five most recently completed calendar years, the school's annual first-time bar passage rate in the jurisdictions reported by the school is no more than 15 points below the average first-time bar passage rates for graduates of ABA-approved law schools taking the bar examination in these same jurisdictions.

*  *  *

(b) A school shall be out of compliance with this Standard if it is unable to demonstrate that it meets the requirements of paragraph (a)(1) or (2).

\* \* \*

28.    Compliance with paragraph (a)(1) of Standard 316 is based on ultimate bar passage rates, whereas compliance with paragraph (a)(2) of Standard 316 is based on first-time bar passage rates.

29.    A law school complies with Standard 316 if it satisfies either of two metrics. Under paragraph (a)(1), compliance with Standard 316 is based on ultimate bar pass rates (i.e., the percentage of a law school graduating class that passed a bar examination).  Under paragraph (a)(2), compliance with Standard 316 is based on first-time bar pass rates (i.e., the percentage of a graduating class that passed the bar on the first attempt).

30.    In contrast to such Standards as 301(a), 501(a), and 501(b) and Interpretation 501-1, Standard 316 is a clear standard and sets forth objective metrics for assessing compliance.

31.    In the period of time relevant to this Complaint, Charlotte was always in compliance with Standard 316, and the ABA never found Charlotte to be out of compliance with Standard 316.

32.    Charlotte's compliance with Standard 316, the standard specifically governing bar pass, made it arbitrary and capricious for the Committee to rely on bar pass data to conclude that the law school is out of compliance with the ABA's "fuzzy" standards that lack objective metrics for assessing compliance.

33.    Standard 206(a) provides:  "Consistent with sound legal education policy and the Standards, a law school shall demonstrate by concrete action a commitment to diversity and inclusion by providing full opportunities for the study of law and entry into the profession by

7

members of underrepresented groups, particularly racial and ethnic minorities, and a commitment to having a student body that is diverse with respect to gender, race, and ethnicity." Charlotte complied with Standard 206, was committed to diversity, and had a diverse student body.

**The ABA's Obligation Under Federal Law to Provide Due Process**

34.     Several sources of federal law require the ABA to afford due process to the schools it accredits.

*The HEA and DOE Regulations*

35.     The Higher Education Act ("HEA") provides that an accrediting agency or association recognized by the U.S. Secretary of Education

> shall establish and apply review procedures throughout the accrediting process, including evaluation and withdrawal proceedings, which comply with due process procedures that provide -- (A) for adequate written specification of -- (i) requirements, including clear standards for an institution of higher education or program to be accredited; and (ii) identified deficiencies at the institution or program examined; (B) for sufficient opportunity for a written response, by an institution or program, regarding any deficiencies identified by the agency or association to be considered by the agency or association -- (i) within a timeframe determined by the agency or association; and (ii) prior to final action in the evaluation and withdrawal proceedings[.]

20 U.S.C. § 1099b(a)(6).

36.     The DOE has promulgated regulations governing due process in the accreditation process ("DOE regulations").  The DOE regulations provide that an accrediting agency "must demonstrate that the procedures it uses throughout the accrediting process satisfy due process." 34 C.F.R. § 602.25.

37.     34 C.F.R. § 602.25, captioned "Due process," provides that an accrediting agency must demonstrate that it:

(a) Provides adequate written specification of its requirements, including clear standards, for an institution or program to be accredited or preaccredited.

(b) Uses procedures that afford an institution or program a reasonable period of time to comply with the agency's requests for information and documents.

(c) Provides written specification of any deficiencies identified at the institution or program examined.

(d) Provides sufficient opportunity for a written response by an institution or program regarding any deficiencies identified by the agency, to be considered by the agency within a timeframe determined by the agency, and before any adverse action is taken.

(e) Notifies the institution or program in writing of any adverse accrediting action or an action to place the institution or program on probation or show cause. The notice describes the basis for the action.

(f) Provides an opportunity, upon written request of an institution or program, for the institution or program to appeal any adverse action prior to the action becoming final.

* * *

(g) The agency notifies the institution or program in writing of the result of its appeal and the basis for that result.

34 C.F.R. § 602.25(a)-(g).

38. Another DOE regulation, 34 C.F.R. § 602.18, captioned "Ensuring consistency in decision-making," provides that an accrediting agency "must consistently apply and enforce [its] standards." This regulation provides that an agency must have "written specification of the requirements for accreditation ... that include clear standards for an institution or program to be accredited." *Id*. § 602.18(a). The agency also must have "effective controls against the inconsistent application of the agency's standards." *Id*. § 602.18(b). And the agency must provide a law school with "a detailed written report that clearly identifies any deficiencies in the [school's] compliance with the agency's standards." *Id*. § 602.18(e).

9

*The Federal Common Law Duty to Provide Due Process*

39.     The HEA and DOE regulations are binding on the ABA.  The HEA and DOE regulations also help to inform the ABA's duty under federal common law right to provide due process to the law schools it accredits.

40.     Accrediting agencies such as the Council and the Committee have an obligation under federal common law to provide due process to the law schools they accredit.

41.     In recognizing the federal common law duty of due process, courts have observed that accreditation agencies, "like all other bureaucratic entities, can run off the rails." *Prof'l Massage Training Ctr., Inc. v. Accreditation All. of Career Sch. & Colls.*, 781 F.3d 161, 169 (4th Cir. 2015).  "[A]ccreditors wield enormous power over institutions—life and death power, some might say—which argues against allowing such agencies free rein to pursue personal agendas or go off on some ideological toot." *Id.* at 170.

42.     Principles of administrative law inform the federal common law duty of due process.

43.     An accreditor's decision violates administrative law principles if it is arbitrary, capricious, unreasonable, an abuse of discretion, not in accordance with law, contrary to constitutional right, without observance of procedure required by law, or not based on substantial evidence (collectively, "arbitrary and capricious").

44.     An accreditor violates administrative law principles if it fails to provide a reasoned explanation for its decisions.

*Fifth Amendment Due Process*

45.     The Fifth Amendment to the United States Constitution provides in part that "[n]o person shall … be deprived of life, liberty, or property, without due process of law …."  U.S.

10

Const. amend. V.

46.     A private entity may be deemed a state actor, and therefore subject to the Due Process Clause of the Fifth Amendment, to the extent that the federal government has delegated governmental functions to the entity, or coerced, pressured, or significantly encouraged the entity to take an action that would be unconstitutional if taken by the government.

47.     InfiLaw officers have information and believe that during the prior Administration one or more DOE officials coerced, pressured, or significantly encouraged the ABA to take adverse accreditation actions against for-profit law schools, including law schools owned by InfiLaw.

48.     In 2017, a now-former DOE official publicly touted on social media as one of his personal "achievements" leading the DOE to impose an "unprecedented restriction on a for-profit law school's" access to the Title IV student loan program.  That official was referring to the Charlotte School of Law, an InfiLaw-owned law school.

49.     InfiLaw officers have information and believe that some ABA officials are biased against InfiLaw-owned law schools because of their proprietary status.  DOE regulations require the ABA to control such bias.  Under the DOE regulations, an accrediting agency must have "effective controls against the inconsistent application of the agency's standards."  34 C.F.R. § 602.18(b).

50.     Historically, the ABA was opposed to and prohibited the accreditation of proprietary law schools.  In 1995, the U.S. Department of Justice filed a complaint against the ABA which alleged, among other things, that "[t]he ABA has required that an accredited law school must be organized as a non-profit educational institution."  Complaint ¶ 17, *United States v. American Bar Association*, No. 95-1211 (D.D.C. June 27, 1995).  The complaint also alleged

that "[t]he ABA has never accredited a proprietary law school." *Id.* In 1996, the U.S. District Court for the District of Columbia entered a final judgment prohibiting the ABA from "adopting or enforcing any Standard, Interpretation or Rule, or taking any action that has the purpose or effect of prohibiting a law school from … being an institution organized as a for-profit entity." Final Judgment at 4, *United States v. American Bar Association*, No. 95-1211 (D.D.C. June 25, 1996).

51.     An accreditor's decisions must be consistent, and the accreditor must provide a reasoned explanation for any departure from past precedent. *See also* 34 C.F.R. § 602.18 (providing that an accrediting agency "must consistently apply and enforce [its] standards"). Like an agency, an accreditor may not defend a decision on new grounds not set forth by the accreditor in its original decision.

### The ABA's 2014 Site Visit to Charlotte and Inspection Report

52.     The ABA fully approved Charlotte in 2011. By 2014, in prompt and direct response to multiple, widespread challenges in legal education, Charlotte had already made significant changes in its admissions policies, curriculum, and bar passage efforts. These changes and improvements continued in and after 2014. The changes made by the law school resulted in applicants with increased LSAT scores and smaller student body sizes (which were reduced by 35% from Fall 2013 to Fall 2015).

53.     On behalf of the ABA Section of Legal Education and Admissions to the Bar, an ABA team visited the law school on March 16-19, 2014 to perform a routine (every three years) site evaluation. The Chair of the evaluation team was at the time a member of the Accreditation Committee and had been the ABA's deputy head of the Section of Legal Education and Admissions to the Bar. The ABA inspection team ultimately produced an Inspection Report, which was released to Charlotte on September 15, 2014.

54.     The Inspection Report was complimentary of Charlotte, including Charlotte's academic program, academic support, and bar passage efforts.  The report stated, among other things, that Charlotte's "new curriculum provides a high level of structured, required courses aimed at substantive knowledge, practice readiness, and bar passage."  The report also stated that Charlotte's "academic success program shows a strong commitment to academic success rather than mere remedial assistance."

55.     As to bar passage, the Inspection Report stated that Charlotte "has made improvement of first-time bar passage one of its priorities and has invested significant resources in identifying and implementing best practices to prepare students for the bar both during law school and after graduation."  The report noted that "from 2010 to 2012 [Charlotte] graduates passed at rates varying from 6.66% above to 7.77% below the rates for graduates of ABA schools in the same states.  In 2013 the bar passage rate dropped to 11.74% below the rates for graduates of ABA schools in the same states."  The report continued:  "In response to this bar passage data, the Law School has instituted a strong and sustained bar passage effort.  This effort is incorporated as part of the CharlotteLaw Edge curriculum as well as in its many additional bar passage efforts."

56.     The Inspection Report presented to Charlotte in September 2014 gave no notice that the ABA would soon begin to question Charlotte's compliance with the ABA Standards and gave no notice of grounds for the ABA to do so.

### The Committee's February 24, 2015 Decision

57.     Less than six months after the favorable Inspection Report, the Committee began to question Charlotte's compliance with some of the ABA Standards.

58.     On January 22-24, 2015, the Committee held a meeting concerning Charlotte and other law schools.

59.     On February 24, 2015, the Committee released to Charlotte its decision, which was styled as "Decision of the Accreditation Committee, January 2015."

60.     In its February 24, 2015 decision, the Committee referenced Standards 301(a), 501(a), and 501(b) and Interpretation 501-1.  The Committee did not conclude that Charlotte was out of compliance with those Standards.  Instead, the Committee requested "additional information to make a determination as to the Law School's compliance with" those Standards. The Committee did not explain the reason for the request, identify what information was missing from the Inspection Report, or specify what additional information it wanted.

61.     On December 2, 2015, Charlotte submitted a detailed response to the ABA's decision.  The submission provided detailed information further demonstrating Charlotte's compliance with the Standards.  .

**The Committee's February 3, 2016 Decision**

62.     On January 21-23, 2016, the Committee held a meeting concerning Charlotte and other law schools.

63.     On February 3, 2016, the Committee released to Charlotte its decision, which was styled as "Decision of the Accreditation Committee, January 2016."

64.     In its decision, the Committee concluded for the first time that Charlotte was not in compliance with Standards 301(a), 501(a), and 501(b) and Interpretation 501-1.

65.     The February 3, 2016 decision included thirteen Findings of Fact, Findings (8)-(20), relating to those Standards.  The substance of the findings was largely drawn from Charlotte's own December 2015 submission, and almost all of the findings described Charlotte's actions and improvements in favorable terms.  Fairly read, those thirteen findings yield the conclusion that Charlotte was in compliance with the Standards and that Charlotte was engaged in sustained and systematic efforts to continue to comply with the Standards.  *See*, *e.g*., Finding

14

(13) ("Upon receiving the results of each … bar examination, the Law School … conducts a thorough analysis of the data and uses it to develop improvements in bar-related programs. In addition, in 2014-15, the Law School undertook several projects to improve portions of its program that are directly relevant to bar outcomes."). The Committee's conclusion of noncompliance was not supported by the Committee's own findings. When findings of fact could support a conclusion of compliance as easily as the opposite conclusion, a conclusion of noncompliance based on such findings is arbitrary and a denial of due process.

66.     Nevertheless, the Committee in its Conclusion 1(a) stated that "[b]ased on the information provided, and in accordance with Rule 12(a)(4), the Committee concludes that the Law School is not in compliance with" Standards 301(a), 501(a), and 501(b) and Interpretation 501-1. The Committee did not support or explain its Conclusion 1(a). Instead, it simply provided this citation: "See Findings of Fact (8)-(20)."

67.     Almost all of the cited findings, having been drawn from Charlotte's own submission, made only favorable statements concerning Charlotte and thus did not support the Committee's conclusion of noncompliance.

68.     Finding (12), which concerned bar passage rates and Standard 316, stated:

> The first-time bar passage differential rate has been worsening over the past few years, and the Law School has been taking measures to address the issue. The 2013 calendar year had a differential rate between the relevant state averages and the Law School average of -8.7 points; 2014 was -12.2 points; and 2015 was -18.4 points. Given the declining 25th percentile LSAT numbers of the classes admitted in recent years, the bar passage differential rate might continue to be 15 points or more below the average first-time bar passage rates for graduates of ABA-approved law schools taking the bar examination in these same jurisdictions.

69.     Finding (12) addressed bar passage rates, a subject covered by Standard 316. Finding (12) did not, however, show Charlotte to be out of compliance with Standard 316, or any

other standard, for several reasons.

70.     First, the cited statistics concerning first-time bar passage rates in 2013, 2014, and 2015 do not demonstrate a violation of Standard 316(a)(2).  Under paragraph (a)(2) of Standard 316, a law school's first-time bar passage rate is sufficient if in three or more of the five most recent years, the school's annual first-time bar passage rate is no more than fifteen points below the average rate.  Finding (12) cited only one year, 2015, in which Charlotte's first-time bar passage rate was more than fifteen points below average.

71.     Second, the statement in Finding (12) that "the bar passage differential rate might continue to be 15 points or more below the average first-time bar passage rates" was nothing but speculation concerning what "might" happen in the future.  Furthermore, Finding (12) itself observed that Charlotte "ha[d] been taking measures to address the issue."  At most, Finding (12) would have justified "a statement calling the law school's attention to the requirements" of the relevant Standard.  ABA Rule 13(b).

72.     Third, even if Charlotte might in the future have had first-time bar passage rates that did not meet the test of paragraph (a)(2) of Standard 316, Charlotte could also comply with Standard 316 under paragraph (a)(1), concerning ultimate bar passage rates.  Under Standard 316, a law school's bar passage rate is sufficient if the school meets "any one" of the tests set out in paragraph (a)(1) or paragraph (a)(2).  In Finding (12), the Committee cited no facts showing that Charlotte did not comply with the tests for ultimate bar passage rates set forth in paragraph (a)(1).

73.     In its February 3, 2016 decision, the Committee directed Charlotte to "provide information to demonstrate that it is in compliance with Standards 301(a), 501(a), 501(b), and Interpretation 501-1" by reporting certain LSAT scores and bar results for its 2010-2016 classes.

The Committee did not, however, indicate what Charlotte would have to do or demonstrate to show compliance with the Standards. The Committee also directed Charlotte to appear at a hearing to determine whether sanctions should be imposed on Charlotte.

74. In a telephone conference on February 25, 2016, between Barry Currier, the Managing Director of the Committee; William Adams, the Deputy Managing Director; and Jay Conison, the Dean of Charlotte, Mr. Currier admitted to Dean Conison that Charlotte did not appear to be out of compliance with Standard 301(a) itself. Mr. Currier's admission was contrary to the Committee's February 3, 2016 decision, which had found Charlotte to be in violation of Standard 301(a).

75. Mr. Currier went on to say that Charlotte should understand that the Committee was treating Standard 301 and Standard 501 together as an integrated, unwritten Standard—an approach not disclosed or suggested in the Committee's February 3, 2016 decision.

76. Mr. Currier told Dean Conison that Charlotte's for-profit status may have heightened the Committee's attention to Charlotte.

77. Mr. Currier did not provide an answer to the question of what Charlotte had to do or show, by way of initiatives, data, or otherwise, to bring itself into compliance in the eyes of the Committee.

### Charlotte's May 2016 Response to the Committee

78. On May 9, 2016, Charlotte responded to the Committee's February 3, 2016 decision with a detailed submission that reported on Charlotte's initiatives and improvements in admissions process, academic program, and bar passage efforts designed to improve its bar outcomes. In its response to the Committee's decision, Charlotte objected that "neither Conclusion 1(a) nor the 13 findings of fact in the Decision Letter make clear what particular acts

or omissions constitute the lack of compliance with the Standards. The findings do not indicate, for example, which aspects of the School's program of education are supposedly deficient."

79.     As difficult as it was for Charlotte to understand the reason for the Committee's conclusion of noncompliance, it was even more difficult for Charlotte to understand what it had to do or demonstrate to come back into compliance with the Standards. As Charlotte stated in its response, the February 3, 2016 decision did not "specify what the Committee expects the School of Law to do in order to bring itself into compliance."

80.     Charlotte directly responded to Finding (12) concerning recent bar passage rates. Charlotte noted that 2015 was the first year that Charlotte did not meet the 15-point requirement and that the predicate for the Committee's concern—the supposedly declining 25th percentile LSAT scores—had been reversed. In fact, Charlotte's "25th percentile LSAT (and other indicators) ha[d] been increasing since 2014 and [wa]s on a trajectory to continue increasing as a result of the School's concerted action to matriculate stronger classes."

81.     Charlotte argued in its response that sanctions were not warranted because the noncompliance found by the Committee was not "[s]ubstantial or persistent" within the meaning of Rule 16(a)(1) of the ABA Rules.

82.     Charlotte also argued that it would be counterproductive to impose a sanction requiring Charlotte to publicly disclose the ABA's conclusion that Charlotte was not in compliance with the Standards. As Charlotte explained, "[a] sanction with any public component would have the inevitable tendency to deter precisely the higher-LSAT students the School of Law is seeking to enroll." It was entirely foreseeable that that the ABA's public notice sanction would have effect described by Charlotte.

**The Committee's July 21, 2016 Decision**

83.     On June 23-24, 2016, the Committee held a meeting concerning Charlotte and other law schools.

84.     On July 21, 2016, the Committee released to Charlotte its decision, which was styled as "Decision of the Accreditation Committee, June 2016."

85.     The Committee concluded in its July 21, 2016 decision that Charlotte was not in compliance with Standards 301(a), 501(a), and 501(b) and Interpretation 501-1.  The Committee did not explain or support its conclusion but cited "Findings of Fact (5)-(44)."

86.     Most of Findings (5)-(44) were drawn from Charlotte's May 2016 submission to the Committee and were favorable to Charlotte.

87.     With respect to bar passage rates, Finding (41) stated that Charlotte's "bar passage rates, as detailed below, remain low, often significantly so."

88.     Finding (42) stated that Charlotte's first-time bar passage rate in February 2016 for North Carolina was more than 15 points below the average, but Charlotte's rate for South Carolina was not more than 15 points below average, as it was about 11 points below.

89.     Finding (44) stated that Charlotte provided bar passage information indicating that it was "in compliance for 2011, 2012, and 2013 with respect to ultimate bar passage," that "[i]t may be in compliance for 2014," and that it was not in compliance for 2015 "at this point."

90.     In addition to concluding that Charlotte was not in compliance with Standards 301(a), 501(a), and 501(b) and Interpretation 501-1, the Committee also concluded that "the issues of non-compliance with Standards 301(a), 501(a), and 501(b), and Interpretation 501-1 are substantial and have been persistent."  The Committee cited ABA Rule 16(a), but that rule does not support the Committee's conclusion.  Rule 16(a) states that sanctions may be imposed for

"[s]ubstantial or persistent noncompliance with one or more of the Standards."  The Committee, however, said only that the "issues" (i.e., questions) of noncompliance were substantial and persistent.

91.     The Committee also stated, without explanation, that Charlotte's "plans for bringing itself into compliance with the Standards have not proven effective or reliable.  Further, [Charlotte] has not shown sufficient cause why it should not be directed to take specific remedial action to come into compliance with the Standards."

92.     The Committee's conclusions violated Charlotte's due process rights.  The Committee's only explanation for its conclusion of noncompliance was its reference to "Findings of Fact (5)-(44)."  Bar passage issues stand out in those findings.  Yet the ABA has a Standard that specifically addresses bar passage rates—Standard 316, which includes particular tests for assessing compliance with the Standard—but the ABA never found that Charlotte was in violation of that standard.  The ABA used bar passage considerations to find Charlotte in violation of Standards 301(a), 501(a), and 501(b) and Interpretation 501-1 without explaining what, if any, metrics it was using in connection with those Standards.  Nor did the ABA ever explain what Charlotte could do or should do to return to compliance with those Standards.  Furthermore, the Committee offered no reasons for its substantial-and-persistent conclusion.

93.     The Committee directed Charlotte to take certain remedial action, including the development of a plan for bringing Charlotte into compliance with the Standards.  The Committee also directed Charlotte to inform its students and post on its website a public notice stating that it was not in compliance with the ABA Standards.  Barry Currier, the ABA Managing Director of Accreditation and Legal Education, subsequently stayed the requirement of public notice until after Charlotte appealed the Committee's July 21, 2016 decision.

94.     The Committee apprised Charlotte that it would be removed from the list of approved law schools if it did not demonstrate compliance with the Standards by February 3, 2018 (two years from the release of its February 3, 2016 decision).

### The Council's November 14, 2016 Decision

95.     Charlotte appealed the Committee's February 3, 2016 decision to the Council.  In its appeal, Charlotte challenged the Committee's "substantial and persistent" conclusion and the public notice sanction.

96.     On October 4, 2016, Charlotte submitted to the ABA its plan for bringing Charlotte into compliance with the Standards.

97.     On October 20-22, 2016, the Council held a meeting concerning Charlotte and other law schools and conducted a hearing with respect to Charlotte.

98.     On November 14, 2016, the Council released to Charlotte its decision, which as styled as "Council Decision, Notice of Probation and Specific Remedial Action, Charlotte School of Law, October 2016."

99.     In its November 14, 2016 decision, the Council rejected Charlotte's appeal.  The Council did not set aside the Committee's "substantial and persistent" conclusion or the public notice sanction.  Instead, the Council *sua sponte* imposed an even more severe punishment on Charlotte:  It put Charlotte on probation.  The Council had given Charlotte no prior notice that it might impose probation as an outcome of the appeal.

100.    The Council gave no explanation for rejecting Charlotte's appeal or for the Council's probation decision.  The Council simply stated that "[f]ollowing the hearing, consideration of the appeal, and based on the record, the Council affirmed the Committee's conclusions that the Law School is not in compliance with Standards 301(a), 501(a), and 501(b).

21

Further, the Council has placed the Law School on probation …."

101.    The Council's imposition of probation was unprecedented and remarkable because never before in its history had the Council put a school on probation without first receiving a recommendation of probation from the Committee.  The Council's imposition of probation also appears to violate Rule 16(c) because the Committee had not recommended probation.  Rule 16(c) provides that the Committee may not impose probation as a sanction, but the Committee may recommend probation as a sanction to the Council.  The upshot of Rule 16(c) is that a sanction of probation is only appropriate, or at least most appropriate, when the Committee has recommended probation to the Council.

**The ABA's Due Process Violations Cause Charlotte to Close**

102.    Since 2009, Charlotte had participated in the federal student financial assistance program under Title IV of the HEA.  Charlotte executed a provisional Program Participation Agreement ("PPA") with the DOE in 2009.  Charlotte also executed a three-year PPA in 2011. Charlotte timely resubmitted a recertification application prior to the expiration of the 2011 PPA, which allowed Charlotte to continue to participate in the program on a month-to-month basis pending approval of is application for recertification.

103.    Shortly after the release of the Council's decision, the DOE on December 19, 2016, sent Charlotte a letter in which the DOE took the unprecedented step of denying Charlotte's recertification application and determined that Charlotte's participation in the Title IV program would not continue into 2017, even though Charlotte remained fully accredited while on probation.  The DOE based its denial on the ABA's decisions concerning Charlotte. Explaining its action, the DOE stated, *inter alia*, that "the ABA has determined that [Charlotte] is, and has been, out of compliance with certain ABA standards and that this noncompliance was

'substantial' and 'persistent.'"

104. The ABA's decisions, which made in violation of due process, caused the DOE to discontinue Charlotte's participation in the Title IV program, which in turn made it impossible for Charlotte to continue to operate as a law school.

105. The DOE's Title IV action meant that students could no longer obtain federal financial assistance to attend Charlotte.

106. On August 11, 2017, Charlotte ceased operating as a law school.

107. In February 2018, the Council withdrew its approval of Charlotte and notified Charlotte of this accreditation decision by letter dated February 13, 2018.

108. Although it does not operate as a law school at this time, Charlotte continues to exist as a corporate entity, and InfiLaw continues to own Charlotte.

109. The ABA's action's caused damage to Charlotte and InfiLaw.  The ABA's actions also harmed Charlotte's students and the graduates of Charlotte.

## CAUSES OF ACTION

### COUNT I
### (VIOLATION OF DUE PROCESS)

110. Plaintiffs repeat and reallege the allegations of paragraphs 1-109 as if set forth fully herein.

111. The ABA in its decisions committed multiple violations of its obligation to provide due process to Charlotte.

112. Contrary to the HEA and DOE regulations, as well as the federal common law due process obligation that is informed in part by those sources of law, the ABA violated due process in the following respects, among others:  The ABA did not apply to Charlotte clear standards for accreditation; did not specify in writing the supposed deficiencies at Charlotte; did

23

not consider Charlotte's responses regarding the supposed deficiencies before taking adverse action; did not describe the basis for its adverse accrediting actions; did not consistently apply and enforce it standards; and did not employ effective controls against the inconsistent application of its standards.

113.    In concluding that Charlotte was not in compliance with Standards 301(a), 501(a) and 501(b) and Interpretation 501-1 the ABA violated the due process required by federal common law.  The ABA's conclusions, adverse findings, specific remedial actions, and probation imposed on Charlotte were arbitrary, capricious, unreasonable, an abuse of discretion, not in accordance with law, contrary to constitutional right, without observance of procedure required by law, and not based on substantial evidence.  The ABA and failed to provide a reasoned explanation for its decisions, conclusions, adverse findings, specific remedial actions and probation imposed on Charlotte.

114.    The Standards articulated by the ABA and applied to Charlotte are vague and lack objective metrics for assessing compliance.

115.    Throughout the accreditation process, the ABA never explained what Charlotte needed to do or show to return to compliance with the Standards.

116.    To the extent that one or more DOE officials during the prior Administration coerced, pressured, or significantly encouraged the ABA to take adverse accreditation action against for-profit law schools, including law schools owned by InfiLaw such as Florida Coastal, the ABA's actions violated the Due Process Clause of the Fifth Amendment.

117.    After the 2014 ABA site visit and Inspection Report, the ABA made decisions inconsistent with the Inspection Report without explaining the inconsistencies.

118.    The Committee's February 3, 2016 decision, which found that Charlotte was not

24

in compliance with Standards 301(a), 501(a), and 501(b) and Interpretation 501-1, contained no findings of facts demonstrating such noncompliance. The Committee did not provide a reasoned explanation for its conclusion of noncompliance.

119. The Committee's July 21, 2016 decision, which again found that Charlotte was not in compliance with the Standards, cited no facts showing a lack of compliance. Once again, the Committee did not provide a reasoned explanation for its conclusion of noncompliance.

120. The Committee did not explain or justify the conclusion in its July 21, 2016 decision that "the issues of non-compliance with Standards 301(a), 501(a), and 501(b), and Interpretation 501-1 are substantial and have been persistent."

121. Contrary to its own Rule 16, the Committee in its July 21, 2016 decision did not find that any actual noncompliance (as opposed to supposed "issues of noncompliance") by Charlotte was substantial and persistent.

122. The Council in its November 14, 2016 decision did not provide a reasoned explanation, or any explanation, for rejecting Charlotte's appeal.

123. The Council did not provide a reasoned explanation, or any explanation, for rejecting Charlotte's challenge to Committee's conclusion that "the issues of non-compliance with Standards 301(a), 501(a), and 501(b), and Interpretation 501-1 are substantial and have been persistent."

124. The Council did not provide a reasoned explanation, or any explanation, for rejecting Charlotte's challenge to the Committee's counterproductive public notice sanction.

125. The Council did not provide a reasoned explanation, or any explanation, for its conclusion that Charlotte was not in compliance with the Standards or its decision to place Charlotte on probation.

126.     Prior to its November 14, 2016 decision, the ABA provided no notice to Charlotte that the Council was considering placing Charlotte on probation, a sanction that the Committee had not recommended to the Council.

## COUNT II
## (DECLARATORY JUDGMENT)

127.     Plaintiffs repeat and reallege the allegations of paragraphs 1-109 as if set forth fully herein.

128.     The Declaratory Judgment Act provides:  "In a case of actual controversy within its jurisdiction, … any court of the United States … may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."  28 U.S.C. § 2201(a).

129.     There is an actual controversy between the parties of sufficient immediacy and reality to warrant issuance of a declaratory judgment.

130.     This Court possesses an independent basis for jurisdiction over the parties.

131.     A declaratory judgment will serve a useful purpose in clarifying and settling the legal relations in issue and will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding.

132.     A judgment declaring that the ABA violated due process in the accreditation process would make it possible for Charlotte to begin the process of attempting to obtain the approvals necessary to resume operating as a law school.

133.     A judgment declaring that the ABA violated Charlotte's due process rights would benefit InfiLaw and the other law schools owned by InfiLaw, Arizona Summit and Florida Coastal, which are also accredited by the ABA.

26

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court:

(a)     Declare that the ABA's decisions regarding Charlotte are arbitrary and capricious and otherwise violate due process;

(b)     Declare that, contrary to due process and the provisions of the HEA and DOE regulations requiring the ABA to articulate and apply "clear" accreditation standards, ABA Standards 301(a), 501(a), 501(b) and Interpretation 501-1 are unlawfully vague and, therefore, unenforceable;

(c)     Grant an injunction requiring the ABA to return Charlotte to the accreditation status it had prior to the ABA's due process violations;

(d)     Grant an injunction barring the ABA from enforcing Standards 301(a), 501(a), 501(b) and Interpretation 501-1 against any law school;

(e)     Grant an injunction requiring the ABA to adhere to all of the requirements of due process in all future accreditation proceedings;

(f)     Award damages for the ABA's violations of due process, including damages to compensate Plaintiffs for causing Charlotte to cease to operate as a law school; and

(g)     Award pre- and post-judgment interest, attorney's fees, and such other and further relief as the Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand trial by jury on all issues so triable.

Respectfully submitted,

/s/ R. Lee Robertson, Jr.
R. Lee Robertson, Jr.
North Carolina Bar No. 44749
ROBERTSON & ASSOCIATES, P.A.
2730 East W.T. Harris Blvd., Suite 101
Charlotte, N.C. 28213-4108
(704) 597-5774
lee.robertson@rlrobertson.com

Paul D. Clement*
Viet D. Dinh*
H. Christopher Bartolomucci*
KIRKLAND & ELLIS LLP
655 15th Street, NW
Washington, DC 20005
(202) 879-5000
paul.clement@kirkland.com
viet.dinh@kirkland.com
cbartolomucci@kirkland.com

*Motion for admission *pro hac vice* to be filed

*Counsel for Plaintiffs Charlotte School
of Law, LLC and InfiLaw Corporation*

Dated:  May 15, 2018